```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
```

PHOENIX BULK CARRIERS BVI LTD                    CIVIL ACTION

V.                                               NO. 15-2565

ASSOCIATED TERMINALS AT                          SECTION "F"
GLOBALPLEX, LLC

ORDER AND REASONS

Before the Court is the defendant, Associated Terminals at Globalplex, LLC's, motion for summary judgment. For the following reasons, the motion is GRANTED.

**Background**

This is a maritime contract dispute arising from Phoenix Bulk Carrier's (PBC's) claim that it was overcharged for dockage fees at a facility on the Mississippi River operated by the defendant, Associated Terminals at Globalplex (ATG).

On December 2, 2014, the M/V BULK CAJUN arrived at the Globalplex Intermodal Terminal on the Mississippi River to be loaded with cargo. PBC chartered the vessel to International Materials, Inc. pursuant to a General Purpose Voyage Charter Party (the Charter Party).[1] ATG operates the Globalplex facility in the Port of South Louisiana.

---

[1] PBC had itself chartered the vessel from Americas Bulk Transport (BVI) Ltd pursuant to a time charter. Accordingly, PBC actually sub-chartered the vessel to International Materials. In the Charter Party between PBC and International Materials, however, PBC is designated as "owner" and International Materials is designated as "charterer."

1

While at the Globalplex facility, ATG performed two separate services for the M/V BULK CAJUN: docking services and stevedoring services. Separate contracts govern the parties' obligations for each service. The rules and rates for the docking services are governed by ATG's Terminal Tariff, a published document that applies to all ships that use the Globalplex facility. The stevedoring services, on the other hand, are governed by a contract between ATG and a third-party company, Diproinduca (USA) Limited. ATG was retained by Diproinduca to perform stevedoring services for the M/V BULK CAJUN.[2]

The M/V BULK CAJUN remained moored at the Globalplex facility until December 13, 2014, a total of 11 days. Pursuant to the rates listed on the Terminal Tariff, ATG charged PBC $18,479 per day for dockage fees. PBC paid the charges in full before departing from the terminal.

The parties agree that there were delays in ATG's performance of the stevedoring services. These delays caused the M/V BULK CAJUN to remain moored at the Globalplex facility for an extra 4.9 days. ATG does not dispute its responsibility for the delays, which were largely due to equipment malfunctions and other impediments at the terminal.

---

[2] The parties fail to explain the nature of the relationship between Diproinduca and the M/V BULK CAJUN. It appears on this record that Diproinduca supplied the cargo to the vessel.

Pursuant to its stevedoring contract, ATG billed Diproinduca $326,124 for the stevedoring services. The contract provided, however, that ATG was liable for the expenses incurred by the vessel as a result of the loading delays (these expenses are called demurrage).[3] Under its contract with Diproinduca, ATG was required to pay the demurrage rate established in PBC's Charter Party with International Materials, a rate of $15,000 per day. Accordingly, Diproinduca billed ATG $65,395.83 (4 days and 8.38 hours at $15,000 per day) for demurrage in accordance with PBC's Charter Party. ATG paid the demurrage charges in full. In turn, International Materials, the vessel's charterer, paid PBC the full amount of demurrage it owed under the Charter Party as a result of the loading delays, a total of $80,403.[4]

PBC claims that the $80,403 it received in demurrage from its charterer only covered the cost of the vessel's operating expenses for the extra 4.9 days the M/V BULK CAJUN remained at the Globalplex facility. The amount did not cover the $18,479 per day that ATG

---

[3] Black's Law Dictionary defines demurrage as "[l]iquidated damages owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time." Black's Law Dictionary (10th ed. 2014).

[4] Both parties do not adequately define the relationships of the various parties (particularly Diproinduca) or provide context for the various transactions. For example, neither party clearly explains how the $65,395.83 paid by ATG to Diproinduca was transferred to International Materials. Nor do the parties explain why there was a difference in the amount ATG paid to Diproinduca and the amount International Materials paid to PBC. For purposes of the pending motion, however, summary relief remains appropriate.

3

charged for docking fees. PBC seeks reimbursement of those fees in the amount of $90,547 (4.9 days at $18,479 per day). PBC claims that ATG is solely at fault for the delays in the stevedoring services and thus should not receive the benefit of the $90,547 for the extra 4.9 days of dockage fees.

ATG moves for summary judgment. It characterizes PBC's claim as one for demurrage, a reparation for extended vessel loading operations. ATG submits that the Terminal Tariff, which governs the parties' obligations for the docking services, explicitly precludes recovery of demurrage "under any circumstances." Moreover, ATG contends that it already paid demurrage for the extended 4.9 days at the rate established by PBC's Charter Party ($15,000 per day). ATG urges that it cannot be held responsible for PBC's failure to negotiate a demurrage rate with its charterer sufficient to account for all of the expenses PBC would incur as a result of a delay in loading operations. Finally, ATG contends that PBC waived its right to dispute the dockage fees because it failed to contest the charges within 30 days as required by the Terminal Tariff.

PBC responds that it is seeking reimbursement for excess dockage fees, not demurrage. It claims that the demurrage paid by ATG to Diproinduca has no bearing on the claims asserted here because the demurrage only offset a portion of PBC's expenses. PBC maintains that it is entitled to recover the remaining portion of

4

the expenses (the dockage fees) it incurred as a result of ATG's delays in its capacity as stevedore. Appealing to equity, PBC asserts that ATG should not be unjustly enriched by its own failure to provide timely stevedoring services. Finally, PBC contends that, at a minimum, there are genuine issues of fact concerning the meaning and application of the Terminal Tariff provisions.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett,

5

477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5 Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claim. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5 Cir. 1987); Fed. R. Civ. P. 56(c)(2). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

## II.

PBC concedes that it is bound by the provisions of the Terminal Tariff.[5] One provision is of particular import:

> DEMURRAGE ON VESSELS
> ATG, as MTO [Marine Terminal Operator], does not assume responsibility for demurrage to vessels under any circumstances. This item is not to be construed as requiring any user of facilities or premise to indemnify ATG for any portion of percentage of losses, if any, caused by the gross negligence of ATG, its agent or employees.

This provision unequivocally precludes any claim against ATG for demurrage in its capacity as the terminal operator. Accordingly,

---

[5] Indeed, the Terminal Tariff is the only contract that exists between the ATG and PBC.

6

the Court must first determine whether PBC's claim for reimbursement of dockage fees is merely a disguised claim for demurrage. The Court finds that it is.

A.

Demurrage is a reparation paid to the ship owner to compensate for vessel time lost. Thomas J. Schoenbaum, Admiralty & Maritime Law § 11-15 (5th ed. 2015). In voyage charters, the ship owner and the charterer delineate the rights and duties of the parties in the event of delays in loading or unloading cargo. Id. If loading operations take longer than the allotted time (called laytime), then the charterer is liable to the ship owner for the costs incurred from the delay. Id. The rate of demurrage is stipulated in the charter party and negotiated between the ship owner and charterer.

Importantly, the demurrage rate is established in the Charter Party between PBC, the ship owner, and International Materials, the charterer. ATG, as the terminal operator, has no say in the demurrage rate. Nonetheless, pursuant to its stevedoring contract with Diproinduca, ATG, in its capacity as stevedore, was bound to pay the demurrage rate established in the Charter Party for any loading delays it caused.

B.

PBC urges that its claim is not one for demurrage. The only support it offers, however, are inapposite cases in which various

7

courts over the past century make reference to both wharfage fees and demurrage. PBC does not invoke any cases in which a ship owner sued a wharf operator exclusively for excess dockage fees. Nor does PBC offer any persuasive (or relevant) support to show that dockage fees are not typically included in the calculations used to set the demurrage rate in a Charter Party. The absence of any jurisprudence in which a ship owner sues for "excess dockage fees" after recovering demurrage is instructive.

PBC does not dispute the time at which it was moored at the Globalplex facility. Nor does it dispute the accuracy of the daily rate that ATG charged for dockage fees. PBC does not allege that ATG breached any of its obligations under the Terminal Tariff. Rather, PBC's only claim is that it incurred excess dockage fees due to ATG's delay in performing its stevedoring services pursuant to a separate contract. It is undeniable that PBC is seeking to recover costs incurred as a result of the delay in loading operations. As such, PBC's claim is an end-run seeking what it renames as "dockage fees" but which is actually "demurrage."

The Terminal Tariff explicitly provides that ATG "does not assume responsibility for demurrage to vessels under any circumstances." The terms of the contract are unambiguous. PBC's only remedy for demurrage arises under its Charter Party with International Materials. It is undisputed that ATG, in its capacity as stevedore, paid the demurrage rate established in the Charter

8

Party as a consequence of its stevedoring delays. Moreover, it is uncontested that PBC received the full contractual rate from International Materials for the 4.9 day delay. If PBC contracted for a rate of demurrage that adequately covered the loading expenses it incurred, then the contract rate would have been higher. ATG's motion for summary judgment is GRANTED.

    IT IS ORDERED that Phoenix Bulk Carrier's claims are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, April 20, 2016

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE